COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges AtLee, Fulton and Friedman

CARSON COLE

v.      Record No. 0660-21-2

MECKLENBURG COUNTY DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
DECEMBER 21, 2021

FROM THE CIRCUIT COURT OF MECKLENBERG COUNTY
J. William Watson, Jr., Judge

(Charles G. Butts, Jr.; Butts & Butts, on brief), for appellant.
Appellant submitting on brief.

(Melissa Fraser; Charles H. Crowder, III, Guardian *ad litem* for the
minor child; Fraser & Freshour, P.C.; Harris, Matthews & Crowder,
P.C., on brief), for appellee. Appellee and Guardian *ad litem*
submitting on brief.


Carson Cole (father) appeals the circuit court's order terminating his parental rights to his

minor child. He argues that the Mecklenburg County Department of Social Services (the

Department) made only limited efforts to reunite father and child and that father substantially

complied with the Department's requirements, demonstrating that father was both willing and

able to remedy the conditions that resulted in foster care. Upon reviewing the record and briefs

of the parties, we conclude that the circuit court did not err. Accordingly, we affirm the circuit

court's decision.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 168 (2014)).

Minor child J.P. was born in February 2019 to Joy-Marie Mae Proffitt (mother).  Because mother had lost her parental rights to a previous child, the Department contacted her later that month.  Mother informed the Department that J.P.'s father was Edward Lynch, Jr., with whom mother was then residing.  The Department assisted mother in obtaining Medicaid for J.P. and implemented a safety plan.

The Department contacted mother again in April 2019, shortly after mother and father married each other.  Mother and J.P. were at that time living in a hotel room with father.  Mother then reported to the Department that she and Lynch "were fighting" and that father, not Lynch, was J.P.'s father.  Mother authorized Department staff to provide various services for J.P.

In July 2019, while J.P. was present, mother allegedly hit father with a can of beans during an argument, leading to mother being charged with assault and battery on a family member.  Following the incident, mother reasserted that Lynch was J.P.'s father and told Department staff that she and J.P. would reside with Lynch going forward.  Mother initially claimed that she blacked out and did not know what happened during the incident but later

---

[1] The record in this case was sealed.  Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised.  Evidence and factual findings below that are necessary to address the assignment of error are included in this opinion.  Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case.  The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

admitted that she hit father and that she and father had "physical altercations." She expressed

uncertainty as to the identity of J.P.'s father and reported having several mental health diagnoses,

including personality disorders, posttraumatic stress disorder, reattachment and attachment

disorders, and unidentified mood disorders.

In August 2019, the Department received a call indicating that mother had again

assaulted father while J.P. was present, this time knocking out one of father's teeth. The

Department petitioned the Mecklenburg County Juvenile and Domestic Relations District Court

(the JDR court) for emergency removal of the child pursuant to Code § 16.1-251. The attached

affidavit contended that removal of the child was necessary in light of mother's "assaultive and

violent behaviors." The Department did not know the identity of J.P.'s father at that time. The

JDR court granted the petition, entered an emergency removal order, and placed J.P. in the

Department's custody. The Department placed J.P. in a foster home.

Following DNA testing, the JDR court entered an order confirming father as J.P.'s

parent. The JDR court also found that J.P. was abused or neglected and set a dispositional

hearing. The Department, through social worker Danielle Fox, filed a foster care service plan,

which the JDR court reviewed and approved. Per the plan, the Department's goal was to return

J.P. to the home or place her with a relative by the end of August 2020. The plan provided

certain steps for mother and father to take to remedy the conditions leading to J.P.'s placement in

foster care. As relevant here,[2] the JDR court ordered father to (1) submit to a psychological

examination; (2) avoid domestic violence situations and obey all Virginia laws; (3) obtain and

maintain full-time employment; (4) obtain suitable housing and demonstrate payment of rent,

utilities, and other household expenses; and (5) successfully complete a parenting class and

---

[2] Mother voluntarily terminated her parental rights in January 2021.

submit verification to the JDR court. The JDR court approved the plan and ordered the Department to allow reasonable visitation between father and child at the Department's discretion.

In October 2019, father began parenting classes and underwent a psychological evaluation. In February 2020, pursuant to Code § 16.1-282, the Department updated the JDR court on the foster care plan, noting that "little progress ha[d] been made" toward the plan's goals. The Department advised that father had obtained full-time employment with R.E. Carroll Logging in January 2020, had attended eight out of a required ten parenting classes, and had completed a psychological evaluation. The Department noted, however, that father still needed to pay the costs of the remaining parenting sessions and that the psychological evaluation indicated that father "would benefit from alcohol psychoeducation, anger management, parenting classes . . . [and] individual therapy." The Department explained that before the Department could return J.P. to him, father "need[ed] to maintain employment and provide documentation that he [was] able to maintain a stable/clean home environment[,] . . . successfully complete parenting classes and seek individual therapy[,] . . . [and] maintain regular contact with [Department] staff." The Department explained that no visitation had occurred "due to the ongoing inconsistencies in completing court requirements." Regarding the goal of relative placement, the Department identified father's sister, Carrie Cole, and scheduled a visit, but Ms. Cole canceled the visit and did not have any further contact with the Department.[3] The JDR court scheduled a permanency planning hearing for July 2020.

In March 2020, Fox sent father a letter reiterating his requirements and informing him that "should [he] not comply with what [was] requested," by the July 2020 permanency planning

---

[3] The Department unsuccessfully attempted to contact Ms. Cole again in March 2020.

hearing, the Department would seek alternative options, which could include adoption. Fox confirmed by telephone that father received the letter. The letter provided that father must, *inter alia*, "[m]aintain regular contact with [Department] staff and the [guardian *ad litem*]"; maintain his full-time employment, "provide [Department] staff with monthly income verification (paystubs) on a regular basis," and notify the Department of any change in employment; and obtain a suitable home. To make his home suitable, father was required to "repair[] the front steps/railings to the home, upgrad[e]/repair[] the flooring in the home, and remov[e] the gas cans located beside the home" and take other safety measures, such as ensuring that the home had working smoke detectors and safety plugs on the outlets. The letter made clear that father must either make such repairs and notify the Department upon completion or obtain an alternative residence and notify the Department "once [he] ha[d] obtained another residence." Father was also required to provide verification that he could pay rent, utilities, and other household expenses on a regular basis. Finally, the letter stated that father must notify the Department if he began a relationship with any other individual and that, should father rekindle his relationship with mother, visitations would cease.

Father completed parenting classes in March 2020. The Department scheduled father's first visit with J.P. for March 23, 2020, but cancelled that visit due to COVID-19. Father had seven visits with J.P. on June 4, June 17, June 30, September 28, October 19, November 10, and December 17, 2020. The Department cancelled three other visits due to COVID-19 on July 15, July 22, and September 8, 2020, and cancelled two visits because father did not timely confirm the visits with the Department on August 25, and October 13, 2020.[4] Father cancelled a visit on December 16, 2020 because he was concerned about the weather, which was rescheduled for the

---

[4] Father was required to confirm each visit twenty-four hours in advance.

following day.  Fox was present at the visits and sometimes another social worker was present.  The guardian *ad litem* was present for the final visit on December 17, 2020.

In June 2020, the Department updated the JDR court on the plan's progress in advance of the permanency planning hearing.  The Department stated that father reported that he was making the necessary repairs to his home, had completed anger management courses in April 2020, began regularly scheduled individual therapy sessions in May 2020, and maintained full-time employment.  The Department reported, however, that father had not provided Department staff with pay stubs or documentation verifying that he had completed parenting classes or anger management or was able to pay monthly rent, utilities, or purchase household expenses.  The Department averred that the visits between J.P. and father had gone poorly and expressed concern "that future visitations may be detrimental to [J.P.'s] emotional state and well-being."  The Department again explained that father "need[ed] to maintain his full-time employment and provide documentation to verify that he [was] able to maintain a stable home environment," provide verification that he had completed parenting and anger management courses, provide verification when he had completed individual therapy, and "maintain regular contact with [Department] staff."  Father completed individual therapy in June 2020.

In December 2020, the Department petitioned to terminate both parents' parental rights pursuant to Code § 16.1-283.[5]  The Department also sought to change the foster care service goal to adoption "[c]onsidering the length of time that [J.P.] ha[d] remained in agency care with minimal progress being made."  The Department noted that father still had not provided verification for any of his requirements and that the Department had to contact other individuals for verification.  The Department also stated that father lost his job in September but did not

_____

[5] As previously noted, mother voluntarily terminated her parental rights in January 2021.

report it to the Department until November,[6] that father had made only one child support payment, and that supervised visits "ha[d] not been successful." Finally, the Department stated that J.P. "ha[d] developed a significant attachment with [her foster] family," which was able to meet J.P.'s needs and had expressed an interest in adopting her. Following a January 2021 hearing, the JDR court terminated father's parental rights and issued a permanency planning order approving the goal change to adoption.

Father appealed to the circuit court. At the circuit court hearing, Fox testified that she informed father that he could not begin visitation until he had completed a parenting class and submitted verification. Because of father's delay in completing parenting classes, visitation did not begin until March 2020, after J.P. had been in foster care for seven months. Fox testified that the visits between J.P. and father went poorly and did not improve throughout the year. Specifically, she testified that J.P. would get upset and cry and "did not like to interact with [father]." When Fox tried to push J.P. into father's arms, J.P. "would push away, she would become upset and cry." During the last visit, J.P. cried so hard she held her breath and Fox had to tell her to breathe. Fox conceded that father did not act scary or harsh toward J.P. to cause such distress. According to Fox, the visits each lasted thirty minutes to an hour.

Fox also testified that father did not notify the Department that he had finished parenting classes or anger management and that Fox had to contact the instructors directly to confirm completion. Moreover, father did not update the Department as his employment shifted and did not provide pay stubs or other employment documentation, nor did he provide documentation indicating that he could pay rent or utilities, as required. Fox testified that father did not begin making regular child support payments until March 2021.

---

[6] Father obtained new employment with W E Simon.

Fox further testified that there were concerns about the physical quality of father's home. The JDR court ordered father to repair the front steps and the railing in front of the home, upgrade or repair the floors, remove gas cans, and take other safety measures. Alternatively, father could move to a suitable home and update the Department that he had moved. Fox testified that father occasionally updated the Department on the status of the home but was having difficulty making all of the repairs because of money problems and because he had to work through his landlord. Ultimately, father never finished the repairs and never provided documentation for any of the repairs. The Department and guardian *ad litem* submitted many pictures of father's home, which showed general disrepair and uncleanliness.

Fox testified that mother told Fox that father had moved following the January 2021 permanency planning hearing. Father did not inform the Department of this move; Fox testified that, accordingly, the Department had not been able to do home visits to address whether father's new living arrangements were suitable.

Fox testified that father told her in March 2020 that his former landlord would provide babysitting services. According to Fox, father testified at the January 2021 court hearing that Jessica Phillips, Carly Cartrum, and Donna Cegelski would provide daycare but did not provide any other information about these women. Fox testified that father repeatedly told the Department that he and mother were separated. Despite these assertions, mother gave birth to another child by father in March 2021. Fox stated that the Department would have included additional requirements had it been aware the mother and father still had a relationship.

Phillips and Cegelski testified that they worked at a local bar and knew father only as a customer at the bar. Phillips testified that she had agreed to "try to help [father] out" if he was ever "in a pickle" but she had never provided father babysitting services before. Cegelski

testified that she had agreed to help father if "an emergency [came] up or something and he [did not] have another babysitter and [Cegelski] was available."

Father testified on his own behalf. He testified that he had been a local truck driver for Austin and Sons Logging since January 2021 and worked twelve hours per day. He testified that, while he was at work, a daycare center in La Crosse, Virginia was his primary babysitting plan. He admitted that he had not told the guardian *ad litem* about this plan because he had "broke off contact" with the guardian *ad litem* and had "quit speaking to him" because the guardian *ad litem* expressed opposition to further visitation in March 2021. He described Phillips, Cegelski, and Cartrum[7] as his "backup babysitters."

Father confirmed that he moved in March 2021 but stated he did not know he had to notify the Department if he moved. He testified that the place to which he had moved was temporary and that he was hoping to move into another residence as soon as that residence was remodeled. He conceded that he had never been inside that prospective residence. He also conceded that, by December 2020, he had not made all requested repairs to his old residence, for example, by replacing a broken window.

Father testified that mother gave birth to another son in March 2021 that father believed to be his. He testified that he and mother were undergoing family counseling and that he had "flip[]-flopped back and forth between divorce and trying to rekindle things." He did not know whether mother would move in with him and J.P.

Father testified that supervised visits with J.P. lasted from twenty minutes to forty-five minutes. He agreed that J.P. cried during the visits and asserted it was because he did not have any contact with J.P. from September 2019 until June 2020 and that she did not really know him.

---

[7] Cartrum was the daughter of father's former boss' girlfriend.

He claimed that Fox would not let him hold J.P. during most of the visits. He explained that he could not initially attend parenting classes regularly because of the holidays and because money was short. Father regularly cited money problems as a reason why he did not complete the requirements. For example, he testified that he did not send the requested paperwork to the Department because he "was not going to spend $100 at the library making copies." Father broke off all communications with the Department in January 2021.

Father moved to strike at the conclusion of all the evidence, which the circuit court denied. After hearing closing arguments, the circuit court terminated father's parental rights under Code § 16.1-283(C)(2).[8] This appeal followed.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Code § 16.1-283(C)(2) states that a court may terminate parental rights if the court finds by clear and convincing evidence that termination is in the best interests of the child and that:

> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed 12 months

---

[8] There was some confusion in the circuit court as to whether father appealed only the termination of parental rights or whether he also appealed the permanency planning order. Ultimately, the circuit court determined that father appealed only the involuntary termination order.

- 10 -

from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Yafi, 69 Va. App. at 552 (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005)). "Proof that the parent . . . , without good cause, ha[s] failed or been unable to make substantial progress . . . in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court . . . shall constitute prima facie evidence" that the Code § 16.1-283(C)(2) standard has been met. Code § 16.1-283(C)(2).

"'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Harrison v. Tazewell Cnty. Dep't of Soc. Servs., 42 Va. App. 149, 163 (2004) (quoting Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 338 (1992)).

Father argues that the circuit court erred in finding that the evidence was sufficient to terminate his parental rights under Code § 16.1-283(C)(2). Specifically, he contends that the Department took only limited efforts to return J.P. to his care and that he substantially complied with the Department's requirements.

Father first asserts that the Department "drastically limited its efforts to reunite the child and correct the situation to achieve reunification of the father and the child." The Department provided numerous services. It monitored father's compliance with the requirements of the foster care plan, arranged supervised visitation, and attempted to identify potential relatives for

alternative placement. Father does not identify any additional services that he believes the Department should have offered. At most, he complains that "[t]he visits were seldom and . . . in a very restrictive situation." COVID-19 unfortunately disrupted the parties' visitation schedule and it is possible, though speculative, that more robust visitation might have strengthened the bond between father and child over time. The circuit court stated, however, that it would not hold the visitation evidence against father, characterizing the evidence that J.P. cried during the visits as "horrifically unfair to" father. The circuit court instead based its decision on father's failure to obtain suitable housing and his decision to cut off contact with the Department and the guardian *ad litem*. Father does not identify any services the Department could have offered to remedy these specific problems. Accordingly, we conclude that the Department's efforts were reasonable and appropriate under the circumstances.

We now turn to whether father was unwilling or unable to remedy the conditions keeping J.P. in foster care. Beginning in September 2019, father was required to (1) submit to a psychological examination; (2) avoid domestic violence situations and obey Virginia laws; (3) obtain full-time employment and maintain that employment; (4) obtain suitable housing and demonstrate payment of rent, utilities, and other household items; and (5) complete a parenting class and submit verification to the JDR court. The Department and the guardian *ad litem* regularly communicated their expectations regarding father's housing situation.

Father indisputably completed a psychological evaluation, parenting courses, and refrained from domestic violence or other illegal activity. And, although his employment changed several times during the period, he was consistently employed. As the circuit court found, however, father fell short in developing a plan to take care of J.P. and documenting that plan to the Department.

First, father did not demonstrate the ability to maintain suitable housing. He made some repairs to his home in accordance with the Department and the guardian *ad litem*'s instructions but did not complete those repairs or provide documentation to the Department. Even had he done so, he changed residences in March 2021 without notifying the Department, preventing the Department from verifying whether his housing situation was suitable for a young child.

Second, father did not provide a suitable daycare plan for J.P. while he worked twelve hours per day. He claimed at trial to have a daycare plan but, due in part to his decision to break off contact with the Department and the guardian *ad litem*, he did not provide documentation for that plan. Moreover, his daycare plan shifted over the course of this matter, with father appearing to have misled the Department at the January 2021 JDR court hearing about the nature of the services offered by Phillips, Cegelski, and Cartrum.

Third, father's continued relationship with mother raises the concern that the conditions necessitating J.P.'s removal to foster care will recur. Father's decision not to inform the Department that he had an ongoing relationship with mother prevented the Department from considering whether additional requirements were necessary, such as the completion of relationship counseling.

Father argues that he "was not unwilling and could not be considered unable to remedy the situation." Under Code § 16.1-283(C)(2), however, the parent must remedy the conditions necessitating foster care *within twelve months*. "Code § 16.1-283(C)(2)'s twelve-month time limit 'was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement.'" Thach, 63 Va. App. at 171 (quoting L.G. v. Amherst Cnty. Dep't of Soc. Servs., 41 Va. App. 51, 56 (2003)). J.P. has been in foster care since August 2019. By the May 2021 circuit court hearing, she had been in foster care for approximately twenty-one

- 13 -

months. At that time, due to father's ill-fated decision to cut off contact, the Department still had no way of knowing whether father had suitable housing. Even if the Department conducted visits to the residence where father was living in May 2021, father testified that his living situation was temporary and that he would change residences again at an unspecified time in the future, which would restart the process once again. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Based on the totality of the circumstances, the circuit court did not err in terminating father's parental rights and finding that termination was in the child's best interests.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.